UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 06 CR 572 |
| | ) | |
| ANDREW POLESE | ) | Hon. Charles R. Norgle, Jr. |
| | ) | |

**MOTION FOR UPWARD SENTENCING VARIANCE**

On February 20, 2007, following a plea of guilty to two counts of a three count indictment, defendant Andrew Polese was convicted of enticing a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422(b) (Count One), and traveling interstate for the purpose of engaging in sexual activity, in violation of 18 U.S.C. § 2423(b) (Count Two). Polese has four criminal history points and faces a Guidelines range of 87-108 months. However, this Guideline range fails to adequately consider defendant's criminal activity and recidivist behavior. Accordingly, the government moves for a sentence one criminal history level higher than contemplated by the Guidelines.

**Factual Background**

**A.  Count One**

In early Summer 2003, KC, a minor then 13 years old, met Polese in an internet chat room that catered to teenagers. Polese sent KC an instant message over the internet, introducing himself as a 16 year-old male living in Florida. However, in his plea agreement, Polese admitted that, at that time, he was a 43 year-old man living in Florida, but misrepresented his identity to unduly influence KC to engage in prohibited sexual conduct. KC and Polese communicated over the internet for a few months, then expanded their communication to include telephone conversations. Sometimes, Polese asked KC to speak to him while posing in front of a "webcam," which transmitted live video of KC to Polese via interstate wires. At Polese's request, KC sometimes posed for the defendant

with her naked breasts or upper body exposed. Also at Polese's request, KC sometimes masturbated in front of the camera, while Polese watched over his computer internet connection. Polese also masturbated in front of his own webcam and sent those images to KC via the internet. By July 2004, Polese and KC also communicated by sending each other letters through the U.S. Postal Service.

Polese admitted in his plea agreement that he knew KC was under 16 years old when he was communicating with her, and that he knew she would not turn 16 years old until July 3, 2005. Polese also admitted sending KC letters, e-mails and instant messages for the purpose of persuading, inducing, enticing or coercing KC to engage in sexual activity with him. Polese further admitted he gave KC gifts, including clothing, toys, underwear, money and alcohol, to persuade, induce, entice or coerce KC to engage in sexual activity with him.

At sentencing, the government will introduce diaries maintained by Polese on one of his computers (seized by warrant and reviewed during the investigation of this case), in which he discusses his desire to be intimate with women under the age of 16 years old. As discussed below, his criminal history reflects that he consistently acted on that desire.

**B.     Count Two**

On May 25, 2005, Polese flew to Chicago, Illinois, from New Bern, North Carolina, for the purpose of having sexual intercourse with KC. Polese and KC spent time that evening at a hotel in Chicago, Illinois, where Polese touched KC between her legs, outside and inside her pants, and also rubbed her vagina. Later that night, Polese drove KC home. Afterward, they communicated over the internet about their encounter.

On May 26, 2005, Polese and KC communicated over the internet in the morning. Later that day, Polese and KC met and spent time together, during which time Polese bought KC food. They then went to a hotel, where Polese massaged, kissed and hugged KC, then drove her home. That

2

evening, they communicated over the internet.

On May 27, 2005, Polese and KC again communicated over the internet in the morning. Later that day, Polese picked KC up in a car and took her to a toy store, where Polese bought KC a stuffed horse named "Bubbles," a Cabbage Patch stuffed horse, a My Little Pony toy and a bobble head dog. After they shopped, Polese and KC went to a hotel room, where they spent the night together. During the evening of May 27-28, 2005, Polese and KC were physically intimate. Among other things, KC straddled Polese's face while naked, Polese performed oral sex on KC, Polese placed his fingers in KC's vagina to masturbate her, and Polese and KC showered together. The next day, after Polese took KC home, they communicated over the internet.

On May 29, 2005, Polese took KC to a toy store, then to a hotel room. That evening, Polese and KC engaged in sexual activity, including oral sex. KC spent the night with Polese in the hotel room.

On May 30, 2005, Polese and KC again engaged in oral sex at a hotel. In addition, Polese and KC engaged in sexual intercourse. Later that day, Polese drove KC home, and they later communicated over the internet about KC losing her virginity to Polese.

On May 31, 2005, Polese picked KC up from school, took her to a hotel room, and had sexual intercourse with KC several times. Also in the hotel room, Polese gave KC $20 for her birthday. Polese flew from Chicago, Illinois to New Bern, North Carolina on June 1, 2005.

### C. Written Communication Between Polese and KC

Attached to the government's version and hereto as Exhibit A are a sample of instant message and e-mail communications between Polese and KC. They are a tiny fraction of the written communications between the defendant and his victim, but they demonstrate Polese's pattern of enticing KC to engage in sexual activity with him.

Several of these hundreds of communications confirm Polese's knowledge about KC's age, the sexual acts they performed during Polese's visits to Chicago and the items KC and Polese bought for each other. For example, the Yahoo Messenger archives detailed the trip by Polese to visit KC from May 25 to June 1, 2005, and contained conversations between Polese (xbubbles101) and KC, or "kd," (t0rn101) on May 30, 2005, discussing her losing her virginity. The Instant Message conversation read:

```
xbubbles101 (06:11:31 PM): I wanna ask u sumfin
t0rn101 (06:11:36 PM): k.
xbubbles101 (06:11:38 PM): can I speak freely
t0rn101 (06:11:43 PM): yes.
xbubbles101 (06:11:59 PM): r u disappointed u don't feel differently
xbubbles101 (06:12:05 PM): I don't kno wut u expected
xbubbles101 (06:12:21 PM): u can b honest
t0rn101 (06:13:26 PM): sry they walked in lol.
xbubbles101 (06:13:31 PM): btw, ty 4 the lotion
t0rn101 (06:13:46 PM): no babe I love knowing the person I want to spend my life with has soemthing I can give no one else that means so much.
t0rn101 (06:13:48 PM): netim.
t0rn101 (06:14:54 PM): babe I am so happy right now.
xbubbles101 (06:14:55 PM): I love u kathryn
xbubbles101 (06:15:00 PM): me 2
t0rn101 (06:15:02 PM): if I was there we'd be doing IT right now lol.
t0rn101 (06:15:32 PM): I miss you.
xbubbles101 (06:16:41 PM): I kno it was ur 1st kd
xbubbles101 (06:16:41 PM): but u were the most sincere and passionate person I kno
t0rn101 (06:17:24 PM): crying yet? lol. hehehe.
t0rn101 (06:17:51 PM): god im guna miss you.
xbubbles101 (06:17:58 PM): u kno wut I mean
xbubbles101 (06:17:58 PM): I tried so much not to hurt u that it kept the fact ur a virgin from my mind
xbubbles101 (06:17:58 PM): and later
xbubbles101 (06:17:58 PM): it really sunk in
xbubbles101 (06:17:58 PM): and I have no words to say to u of how I feel
xbubbles101 (06:18:12 PM): nothing will express wut I feel inside
xbubbles101 (06:18:30 PM): I feel like I cud lift a car
xbubbles101 (06:18:54 PM): no, not crying. fighting tears a little
xbubbles101 (06:19:07 PM): everything with u is so perfect
xbubbles101 (06:19:20 PM): my life wont be the same till I can see u again
```

On June 1, 2005, the day after KC and Polese had sex for the first time, KC told Polese, "lol no i don't feel sore at all...not until u were in me. I CAN SAY THAT NOOW!" and they discussed

4

"having" each other and trying to use condoms. Later that day, Polese was complimenting and thanking KC and wrote, among other things, "[you] let me totally into ur heart and gave me ur virginity." KC signed off line that night by calling Polese, "my little virginity taker."

Other emails and IM's during Polese's May trip chronicle their day-to-day activities. They discuss holding each other, showering together, swallowing each other, their body parts, what KC needed to pack to stay at the hotel, where they could meet, what they would do, etc.

On June 11, 2005, KC (t0rn101) and Polese (bibblegoddess101) discussed their previous sexual intercourse:

```
bubblegoddess101    sex n making love isnt about experience
bubblegoddess101    its about communication
bubblegoddess101    knowing wut ur partner likes
bubblegoddess101    and u kno me
bubblegoddess101    and u were really great
bubblegoddess101    the couple of time we shared each other was a
                    lifetime of love
bubblegoddess101    it was perfect
bubblegoddess101    its never about just sharing physical touch
bubblegoddess101    its about sharing souls
t0rn101             it did feel like u were taking care of me. like
                    in our stories. and it's what I've wanted for so
                    long
bubblegoddess101    and we do that all the time
t0rn101             and wen u were helping me figure out stuff when i
                    tried top
t0rn101             I'm never guna get it lol
bubblegoddess101    thats not important
bubblegoddess101    and you will
t0rn101             well i know lol
bubblegoddess101    not for me
t0rn101             I'm too stubborn
bubblegoddess101    neh
t0rn101             lol
t0rn101             i tried
t0rn101             I'll do it again
bubblegoddess101    u succeeded
t0rn101             eh.
bubblegoddess101    u did
```

On December 2, 2005, KC chatted with Polese on the Internet and they discussed their prior sexual relationship. Polese was using the screen name xButtMunch101 and KC was using the screen

5

name t0rn101. The chat conversation was as follows:

>**xButtMunch101**: and, of course u kno wut I like most
>**xButtMunch101**: I think u kno neway
>**t0rn101**:...
>**xButtMunch101**: wen u knelt over me
>**t0rn101**: when u went down on me?
>**xButtMunch101**: well yes but u actually came down over me

On December 15, 2005, KC chatted with Polese on the Internet. Polese was using the screen name xButtMunch101 and KC was using the screen name t0rn101. This conversation was witnessed by Detective Dan Everett, one of the case agents assigned to this investigation. The chat conversation was as follows:

>**t0rn101**: well u were my first.
>**t0rn101**: what was the best part in bed?
>**xButtMunch101**: u kno
>**xButtMunch101**: well
>**t0rn101**: I wanna know.
>**xButtMunch101**: it was all so natural with u
>**xButtMunch101**: like clothes didnt matter
>**t0rn101**: yea.
>**xButtMunch101**: u cud be naked n I wud just be in awe how absolutely beautiful u r n then in just a look ud get me excited

The Instant Message chat archives also include messages from Polese stating he had kept items from his trips to Chicago to see KC including stories, poems, songs, pictures and clothing items that she had given him. On December 5, 2005, in a chat, Polese told KC he found the "red thing," which KC identified for case agents as a red Victoria's Secret top, hidden in a secret drawer in his dresser. During the same December 5, 2005, chat, Polese also said he still had a shirt from "Spunky's Milkshake Shack" that he received from KC, body paint, mascara, two writing pads from the Spring Hill Suites Hotel, ticket stubs from a Chicago airport, and a packing slip for a ring he bought her.

On January 12, 2006, Polese (AJPNCS) and KC (t0rn101) had an Instant Message chat, during which Polese confirmed their exchange of pictures:

6

> **t0rn101**: my old email accounts were deleted bc I havent used them in a long time
> **t0rn101**: and I lost a lot of emails
> **t0rn101**: so do u think I could go through yours n pick out what I want?
> **t0rn101**: bc I miss going back and reading your emails n stuff
> **AJPNCS**: wut sn's don't work
> **AJPNCS**: I don't kno wut I have
> **t0rn101**: onelastepiphany vampireeyes emerald vampyress th0rns
> **AJPNCS**: I cud just mail everything back to u
> **AJPNCS**: who was I
> **t0rn101**: everything lol
> **t0rn101**: ems xbubbles ummm
> **t0rn101**: I don't know
> **AJPNCS**: I want to ask u this
> **AJPNCS**: and it wont hurt
> **AJPNCS**: but did u delete them
> **AJPNCS**: or lose them
> **AJPNCS**: I understand if u deleted them
> **t0rn101**: no
> **t0rn101**: I deleted pictures
> **AJPNCS**: pics?
> **t0rn101**: but I just went into my old emails n they said everything was deleted
> **t0rn101**: that I sent u n whatever u sent me
> **t0rn101**: n just songs n crap I had
> **AJPNCS**: I did that too a while back
> **AJPNCS**: im not guna send u ne pics u sent me
> **AJPNCS**: not pics of u I mean

KC and Polese had several conversations during their relationship indicating he knew her true age, and further confirming that he knew it was illegal – or at least improper – for him to have sexual contact with KC at her age.

• On August 7, 2005, Polese told KC that he was going to write her a story that would start July 4, 2007 (the day after her 18th birthday). He says, "since the story is in the future there cud be touching . . ." which shows he knew when it would be legal for him to have sex with KC.

• On June 3, 2005, Polese told KC he wanted to tell his mother about her, but couldn't, saying, "i will tell them as soon as it is all legal." Later that day, Polese asked KC, "so do u just get ur license wen u turn 16."

• On June 7, 2005, Polese and KC discussed him moving to Chicago, but he told her he could not do that until she was legal, because first the police would know, and then his mother would

know. Later in the same chat, Polese told KC should would have a better idea about her future by the time she entered college, and she said, "acceptance can happen sometimes ur junior year."

• On August 13, 2005, Polese told KC he was going to have to tell his mom about her, and "if ur 18 she'll be less opposed . . . but i wasnt guna wait that long."

• On August 14, 2005, KC and Polese discussed whether she should have told "spud" about their relationship. Polese was worried he couldn't be trusted, and told KC, "we have 3 yrs ahead," indicating they had 3 years until KC turned 18.

• The next day (8/15/05), KC and Polese were discussing whether KC had any money saved, and whether she should get a job. She told Polese, "n its only a year away till i cud get a license." Later in the same conversation, they discussed when KC's parents would allow her to "shareboard" her own horse, and she told Polese she could shareboard "wen im 16." Also in the same conversation, Polese and KC discussed what they could do to each other "wen i 1st see u or wen ur 18."

On June 9, 2005, KC and Polese discussed possible weekends he could visit Chicago. KC told Polese, "omggg u cud come around my bdaaaay!!!," which he ended up doing. In addition, an unplugged laptop in Polese's attic in New York contains KC's saved screen profile, which lists her birthday as 7/3/89. A computer expert was able to retrieve from this computer some chats between Polese and KC during the months after her parents found out they were talking and before Polese flew to Chicago. In those chats, Polese discusses why he lied to her and lured KC back in by telling her how much he cares about her.

Importantly, defendant waited until after his probation ended to travel to Chicago to have sex with KC. This decision to delay acting on his plan is consistent with his prior criminal history pattern, *i.e.*, waiting until his prior sentence is completed before committing another crime. In this

8

case, Polese's plan did not work, because the government charged defendant with enticing KC to have sex with him, and Polese's pattern of enticement began before his prior probationary period ended. Nonetheless, it was clearly Polese's intent to wait to have sex with KC — not until she was old enough for it to be legal, but rather until a date when it would not add to his criminal history.

## Guidelines Calculations

Defendant Polese has an extensive record of sexual misconduct. On February 11, 1982, he was convicted of public indecency in Ohio, and sentenced to a 30-day suspended sentence. Pursuant to Guideline § 4A1.2(e)(1), defendant receives no criminal history points for this conviction. On January 27, 1989, defendant was convicted of indecent exposure in New Bern, North Carolina, and sentenced to a 6-month suspended sentence. Pursuant to Guideline § 4A1.2(e)(1), defendant receives no criminal history points for this conviction. On April 24, 1991, defendant was convicted of indecent exposure in New Bern, North Carolina, and received a 6-month suspended sentence and 3 years probation. Pursuant to Guideline § 4A1.1(c), defendant receives 1 criminal history point for this conviction. On February 4, 1993, defendant was convicted of indecent exposure in New Bern, North Carolina, and received a 24-month suspended sentence and 5 years probation. Pursuant to Guideline § 4A1.1(c), defendant receives 1 criminal history point for this conviction. Defendant committed the instant offense while under a criminal justice sentence, namely, probation, for the latter two convictions set forth above. Pursuant to Guideline § 4A1.1(d), defendant receives 2 criminal history points. His total criminal history points is therefore 4, for a criminal history category of III.

Pursuant to the plea agreement, the parties agree that defendant's adjusted base offense level is a level 27, calculated as follows:

24     Base offense level (Guideline § 2G1.3(a))

| | |
|---|---|
| +2 | knowingly misrepresented identity to unduly influence KC to engage in prohibited sexual conduct (Guideline § 2G1.3(b)(2)) |
| +2 | used a computer to commit the crime (Guideline § 2G1.3(b)(3) |
| +2 | commission of a sex act or sexual contact (Guideline § 2G1.3(b)(4)) |
| -3 | acceptance of responsibility |

Defendant's adjusted base offense level is therefore 27, and his Guidelines range is 87-108 months.

Although the Sentencing Guidelines are no longer mandatory, this court should continue to calculate and consider the proper guidelines range in determining an appropriate sentence. *United States v. Tyra,* 454 F.3d 686, 687 (7th Cir. 2006); *United States v. Mykytiuk,* 415 F.3d 606, 607 (7th Cir. 2005). Moreover, the correct Guideline sentence can provide meaningful direction in the district court's imposition of a final sentence. *See United States v. Baretz,* 411 F.3d 867, 876 (7th Cir. 2005) (incorrect application of Guidelines requires resentencing even under an advisory regime). This court should calculate the proper Guidelines range, then use its discretion and decide whether to sentence the defendant within or outside that range. *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1107 (7th Cir. 2006). Next, the court must evaluate the particular statutory factors that inform the sentence it imposes. *Id.* The Guidelines authorize an upward departure where, as here, "reliable evidence" indicates that a defendant's criminal history category does not adequately reflect the seriousness of his past conduct or there is a high likelihood of recidivism. *United States v. Angle,* 315 F.3d 810, 811 (7th Cir. 2003); U.S. SENTENCING GUIDELINES MANUAL § 4A1.3(a)(1) (2006).

**Argument**

1.  **This Court Should Grant an Upward Sentencing Variance Because Defendant's Criminal History Does Not Adequately Reflect its Seriousness**.

Defendant's criminal history category should be increased to a criminal history category of four for two reasons. First, defendant has successfully convinced prior courts to suspend his sentences and ignore (or never learn of) his prior convictions for essentially the same offense, *i.e.*, inappropriate sexual contact with minors. Second, defendant has engaged in a recidivist pattern of sexual misconduct not adequately considered by the Guidelines.

Inadequacy of a defendant's criminal history category is an "encouraged" basis for an upward variance. *United States v. Simmons,* 343 F.3d 72, 78 (2d Cir. 2003). When deciding whether to impose a departure based on an encouraged ground, such as inadequate representation of criminal history, the court should ask, "[w]hat features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?" *United States v. Koon,* 518 U.S. 81, 95 (1996). Then, "[i]f the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account." *Id.* at 96.

In this case, the imposition of prior suspended sentences in different districts fails to adequately capture the defendant's recidivist criminal past. If the defendant was not in the habit of changing his residence, he likely would have received imprisonment for his subsequent criminal convictions. But because the defendant committed sexual offenses in more than one state, there is likely no institutional history of his prior crimes or sentences, and he got a fresh start each time he was caught.

The Seventh Circuit has conducted this analysis in similar cases, and has granted motions for increased criminal history calculations. For example, in *United States v. Goines,* during

sentencing, the Seventh Circuit considered the fact that defendant received a suspended sentence for a prior drug conviction. 988 F.2d 750, 778 (7th Cir. 1993). The Court reasoned that if a defendant has been convicted of the same crime more than once, "he has demonstrated the need for greater sanctions to deter him from committing that same crime again. . . ." *Id.* If defendant's previous drug conviction had not been stayed, he would have received a criminal history category of III instead of I. *Id.* Accordingly, in that case, it was appropriate for the district court to depart upward to a criminal history category of III, taking into account his criminal acts, despite the prior court's more lenient treatment. *Id; see also United States v. Gayle,* 389 F.3d 406, 410 (2d Cir. 2004) (one-level upward departure was warranted where defendant received multiple lenient sentences for possession of a firearm).

An upward variance is similarly warranted where, as here, a defendant who has engaged in a history of sexual exploitation has been treated leniently by prior courts. In *United States v. Miller,* the district court found that, "the fact that Miller continued to engage in criminal activity despite the very lenient sentences she received was relevant" to sentencing. 127 F. App'x 531, 532-33 (2d Cir. 2005). In another case, *United States v. Smith,* the presentence investigation report revealed that Smith had at least three prior sex-related convictions, including a violent rape, for which he received a ten-year suspended sentence. 20 F. App'x 412, 416-17 (6th Cir. 2001). Smith's suspended sentence was revoked and imposed when he was subsequently convicted of raping a fourteen-year-old girl. *Id.* at 417. Based on Smith's history of sexual exploitation, the Sixth Circuit upheld a criminal history category of VI and affirmed the district court's finding that Smith was a career criminal, despite that a traditional Guidelines calculation would have been more favorable to the defendant. *Id.* at 419, 421-22. The court addressed multiple rationales for the District Court's sentence including:

> the defendant's long-standing pattern and practice of unconscionable manipulation of naïve adolescents…and the social interest in quarantining immoral predatory pedophiles like Smith from vulnerable and gullible children for the maximum duration authorized by the law.

*Id.* at 421.

Defendant Polese has also received a series of lenient sentences for his lewd behavior toward minors. Because each sentence was suspended and defendant moved among districts between convictions, Polese never served jail time for his crimes. Polese has benefitted from the leniency of the justice system several times, but clearly has not learned his lesson. *See Miller,* 127 F. App'x at 532-33 (considering the fact that Miller received lenient sentences but still engaged in an escalating pattern of criminal conduct to warrant an upward departure). Polese exposed himself to children in public not once, but four times. Since then, Polese escalated his criminal conduct from public indecency to the enticement and statutory rape of a fourteen-year old girl.

This pattern of behavior takes Polese's case outside of "the heartland" of the Sentencing Guidelines and warrants a more severe sentence. *See Koon,* 518 U.S. at 95 (discussing the factors a district court must consider when making the decision to depart upward from the guidelines). The defendant is smart: he realizes that the state of Ohio would not be privy to information about his North Carolina conviction, and vice versa. He is aware of this loophole and has taken advantage of it, knowing the courts are unlikely to catch his cleverness. Moreover, defendant purposely avoided meeting KC for sex until after the expiration of his probation on his prior North Carolina convictions. Defendant's clever avoidance of criminal sanctions against him takes this case outside the contemplation of the Guidelines (which account for courts and probation officers knowing what defendant has done in the past) and this court should depart upward to adequately address Polese's criminal behavior. *See Koon,* 518 U.S. at 93 (finding that the Sentencing Commission did not intend

13

to strictly limit grounds for upward departure because "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision"). Inadequate representation of the defendant's true criminal history is an encouraged basis for a variance of this level. *Simmons,* 343 F.3d at 78. Polese's suspended sentences prevent a true reflection of his criminal character. This Court should look to the Polese's suspended sentences as well as the crimes that triggered those sentences and depart upward.

To more adequately account for defendant's criminal history, the government proposes that this court consider Polese's prior suspended sentences as if they were actually jail time. Accordingly, he should receive two criminal history points for his 1991 6-month suspended sentence, and he should receive 3 criminal history points for his 1993 24-month suspended sentence. That changes his criminal history calculation from a III to a IV, for a Guideline range of 100-125 months, instead of 87-108 months. Such a calculation accounts for Polese's true criminal history.[1] This sentence is also consistent with the factors set forth in 18 U.S.C. § 3553(a), most significantly, the background and characteristics of the defendant (which are not adequately considered by a simple Guidelines calculation) and the need to protect the public of minor children he molests (which is only safe when Polese is behind bars).

---

[1] This upward variance gives Polese the same Guidelines credit he currently receives, by not counting his 1982 and 1989 convictions (which are over 15 years old), and assumes in his favor that his punishment would not have been more severe, had the sentencing courts have known about his true history as a repeat sex offender. The court could consider these older crimes, but would result in a 2-level upward variance, which the government is not seeking here. *See United States v. Turchen,* 187 F.3d 735, 742 (7th Cir. 1999) (finding that Turchen's "unconvicted" criminal conduct evidenced "dangerousness, violence, and depravity" and the Court could only protect society and do justice to the goal of the Guidelines by departing upward).

14

### 2. The District Court Should Grant a Sentencing Variance Because, as a Sex Offender, Polese is a Likely Recidivist.

This Court may also give defendant an above-Guidelines sentence if it finds he is likely to commit additional sex offenses in the future. *See Turchen*, 187 F.3d at 742 (upward departure warranted when there is a high likelihood that defendant will commit future crimes). In *Turchen,* the Seventh Circuit affirmed an upward departure where the defendant's criminal history was under-represented, as well as because his continued criminal conduct posed a danger to the community. *Id.* More specifically, the court found that Turchen's use of the internet to distribute child pornography and his vast collection of pornography made it more likely he would continue to commit sex crimes, and affirmed the district court's imposition of an above-Guidelines sentence. *Id. See also United States v. Griffith*, 344 F.3d 714, 717 (7th Cir. 2003), where the Seventh Circuit affirmed the district court's above-Guidelines sentence for distribution of child pornography, because Griffith had two prior convictions, one of which was outside the statute of limitations, for sexual misconduct with minors. In *Griffith*, the district court was convinced that, due to defendant's criminal history and unsuccessful rehabilitation, he would sexually exploit or abuse children in the future. *Id.* at 719.

Like the defendants in *Griffith* and *Turchen,* sentencing courts have mandated that Polese attend counseling for his sexual predilection toward minors. However, Polese's criminal history and criminal conduct toward KC demonstrate that Polese has not and will not change his criminal behavior in the future. He is attracted to young girls and makes no apologies for this preference. Similarly, in *Turchen,* the Seventh Circuit rejected Mr. Turchen's contention that his psychological treatment should be considered a mitigating factor in sentencing. *Turchen,* 187 F.3d at 742. Further, the Seventh Circuit suggested that Mr. Turchen's *unsuccessful* attempts at rehabilitation

actually were to his detriment and supported the district court's finding that Turchen was likely to resort back to the sexual exploitation of children, since the counseling had not worked. *Id.* In supporting this finding, the court considered the fact that much of Mr. Turchen's pornography collection amassed after his supposed "rehabilitation." *Id.* Again, like Turchen, defendant Polese sexually exploited KC *after* his unsuccessful attempts at rehabilitation. Accordingly, this court should consider Polese's failed psychological treatment as proof of his recidivist potential.

Given Polese's four previous convictions for inappropriate sexual conduct and his current offense, it is likely that he, too, will continue his predatory behavior toward underage children. Polese has carefully evaded jail time and at the same time, has escalated the degree of his criminal conduct. His public indecency convictions and subsequent suspended sentences are not isolated to one state: he moved his criminal behavior from Ohio to North Carolina, and now, from North Carolina to Illinois. He went from exposing himself to children to using the internet to develop and consummate a three year, sexual relationship with a thirteen year old girl. Like the defendant in *Griffith,* Polese has shown this court that he has the will and ability to manipulate children. *See Griffith,* 344 F.3d at 717. Polese's sentence should be increased accordingly.

Lastly, as a child sex offender, Polese is even more at risk for recidivism than many other criminals. Both Congress and the Sentencing Guidelines recognize the high rate of recidivism for sex offenders, and especially for child sex offenders. *See United States v. Allison,* 447 F.3d 402, 405-6 (5th Cir. 2006) (finding that life terms of supervised release for sex offenders emerged in response to the concerns of federal judges and prosecutors that sex offenders were not receiving adequate supervision after their release); 18 U.S.C.§ 3583(k) (2006); U.S.S.G. § 5D.1.2(b). This is Polese's fifth conviction for improper sexual conduct involving a minor. Considering this pattern and the escalation of his criminal conduct, Polese is likely to repeat his criminal behavior in the

future. As a result, this Court should depart upward and keep Polese "from vulnerable and gullible children for the maximum duration authorized by the law." *Smith,* 20 F. App'x 412 at 421.

## Conclusion

For the reasons set forth herein, the government requests that this court sentence Polese to a prison term within a Guideline range of 100-125 months, instead of 87-108 months.

Dated: March 19, 2007

        Respectfully submitted,

        PATRICK J. FITZGERALD
        United States Attorney


        By: /s/ Lisa M. Noller
          LISA M. NOLLER
          Assistant United States Attorney
          219 South Dearborn Street
          Chicago, Illinois 60604
          (312) 353-5314

**Certificate of Service**

The undersigned Assistant United States Attorney hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5 and the General Order on Electric Case Filing (ECF), that the United States' Motion for Upward Sentencing Variance was served on Sean Harrison, pursuant to the district court's ECF system, on March 19, 2007.

> By: s/Lisa M. Noller
> LISA M. NOLLER
> Assistant United States Attorney
> 219 S. Dearborn Street
> 5th Floor
> Chicago, Illinois 60604
> (312) 353-5314